# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN F. CURRAN, III, | : | CIVIL NO. 1:11-CV-2127 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| CARBON SPYDER, *et. al*, | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

Before the Court is the Defendants' motion (*doc. 129*) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, we recommend granting the Defendants' motion.

### II. Background.

#### A. Procedural Background.[1]

On April 20, 2012, the plaintiff, John F. Curran ("Curran"),[2] submitted three separate documents, titled "Amended Complaints," to the Court. Only one of

---

[1] Considering that we write primarily for the parties, we need not repeat the entire procedural history of this case, which is set forth in our November 9, 2015, Report and Recommendation (*doc. 126*).

[2] The evidence of record also shows that Curran refers to himself and is referred to as "Jef." *See doc. 131-4* at 4.

those documents had the docket number of this case in its caption.  The Clerk of Court was directed to docket that document as the amended complaint in this case. The Clerk of Court was also directed to docket the other two documents as complaints in two new and separate cases, *Curran v. M&T Bank Corp.*, 1:12-CV-00749 (M.D. Pa.), and *Curran v. Mark Zinnamosca & Assoc.*, 1:12-CV-00750 (M.D. Pa.).

In the Amended Complaint relating specifically to this case (*doc. 47*), Curran names the following three defendants: (1) Carbon Spider; (2) John L. Mitchell ("Mitchell"); and (3) Ronald Welsh ("Welsh").[3]  With respect to Carbon Spider and Mitchell (collectively, "the Defendants"), Curran raises claims of: (1) breach of contract, and (2) libel and slander.  In response, the Defendants have filed a motion (*doc. 129*) for summary judgment, requesting that judgment be entered in their favor on all claims raised in Curran's Amended Complaint.  The Defendants' motion has been briefed and is ripe for disposition.

**B. Factual Background.**

Neither the Amended Complaint, nor the documents submitted with the Defendants' motion for summary judgment, adequately describes the parties, their dealings, or the events that led them to federal court.  Thus, we have independently

---

[3] Welsh has since been dismissed from this action.  *See docs. 48*, *52*.

and thoroughly reviewed the record, in order to cobble together the following factual background.

Based upon our review, it generally appears that the interworkings of the parties' respective businesses and the dealings that those businesses had with one another, slowly broke down and destroyed the parties' working relationships in the process.   One of those businesses, Gargoyles, Inc. ("Gargoyles"), was "an advanced materials application company," headquartered in Westminster, MD, that offered "unique and advanced materials using three distinct technologies: 3-D Synthetic Fabric Architecture, Braided Synthetic Tubular Structures, and Nano-Particle, Thin Film Matrices." *Doc. 131-4* at 51.  Curran was once the President and Chief Operating Officer ("COO") of Gargoyles.  *Id.* at 4.  Mitchell, who owned a company by the name of Carbon Spider,[4] was also once employed by Gargoyles.[5] *Id.* at 4, 51.

---

[4] The record is generally replete with information regarding Carbon Spider.

[5] We note that, during Mitchell's employment with Gargoyles, the "Department of Child Support Services County of Orange" in Santa Ana, California was directing Gargoyles to withhold a portion of Mitchell's earnings and to forward that sum of earnings for the purpose of paying child support and health care coverage for his dependents.  *See doc. 131-5* at 3-5, 7; *see also doc. 131-4* at 31.  We further note that Curran testified at his deposition that Gargoyles paid a portion of Mitchell's back child support payments in order to avoid Mitchell's bank accounts being levied by the state. *Doc. 131-3* at 14:11-15:1.

While Curran was still Gargoyles' President and COO, Gargoyles submitted a proposal, on April 15, 2009, to Wyvern Technologies, Inc. ("Wyvern"), a company headquartered in Santa Ana, California. *See generally doc. 131-4 at 50.* In this proposal, Gargoyles agreed to furnish all labor and materials needed to manufacture a "Standard Sample Set per the specifications spelled out in contract NGC P/N 14-76165-501" (hereinafter, "the Wyvern Project").[6] *See generally id.* Based upon the record, as a whole, it appears that Wyvern accepted Gargoyles' proposal.

Shortly thereafter, it appears that Gargoyles, on April 24, 2009, entered into a lease agreement, with Martin Investment Company, a California Limited Partnership. *Doc. 131-4 at 8.* Under this lease agreement, Gargoyles rented a 1,200 sq.ft. industrial unit in Santa Ana, California—the same city where Wyvern is headquartered—from May 15, 2009, until May 14, 2010. *Id.* Gargoyles also entered into an insurance contract with Kimbrell Insurance Agency, located in Orange, California. Under this contract, Gargoyles obtained "commercial general liability" coverage for the leased unit in Santa Ana. *Doc. 131-4 at 34-38; see also doc. 131-5 at 19-21.*

---

[6] Apparently, the proposal for this "Standard Sample Set" was originally quoted by Carbon Spider. *See doc. 131-4 at 50-51.* It appears, however, that Mitchell, acting on behalf of Carbon Spider, later transferred the proposal to Gargoyles. *See id.*

4

It further appears that on September 15, 2009, Gargoyles—perhaps, in order to complete the Wyvern Project—entered into a "Subcontract Agreement" (the "Subcontract") with Carbon Spider. *See doc. 131-4* at 2-4. This Subcontract defines Gargoyles as the "Contractor" and Carbon Spider as the "Subcontractor." *Id.* at 2. This Subcontract further states that Carbon Spider "has entered into, or will hereafter enter into,  a general production contract" with Wyvern in order to: (a) perform in accordance with various contract documents and specifications prepared by Wyvern; and/or (b) furnish the labor and materials needed to construct a project titled, the F5 Inspection Coupon. *Id.*  Thus, under the Subcontract, Gargoyles employed Carbon Spider as an "independent contractor" to furnish all the labor, materials, tools, supplies, equipment, services, facilities, supervision, and administration that was necessary for completion of the F5 Inspection Coupon. *Id.* In consideration of Carbon Spider's performance, the Subcontract states that Gargoyles would pay Carbon Spider the total sum of the following: (1) Commission: $20,000; (2) Annual tool rental commencing on effective date of the Subcontract: $30,000; and (3) Labor and materials: $30,000. *Id.* As detailed in the Subcontract, Wyvern was to pay Carbon Spider $102,000 for completing the F5 Inspection Coupon; then, Carbon Spider was to reduce the aforementioned payment schedule—i.e., (1) Commission: $20,000; (2) Annual tool rental commencing on effective date of the Subcontract: $30,000; and (3) Labor and

5

Materials: $30,000—from the Wyvern proceeds and pay Gargoyles the balance of $22,000.[7]  *Id.* at 2.  The Subcontract also stated that "[a]ny and all tooling, molds, shop aids, and material used and produced for the manufacturing of the [F5 Inspection Coupon] will become [an] asset, and held in ownership of [Gargoyles]." *Id.* at 2-3.[8]

In order to perform this Subcontract, it appears that Mitchell went to Santa Ana, California, where he worked out of the 1,200 sq. ft. unit Gargoyles was renting from Martin Investment Company.  *See generally doc. 131-5* at 19-21.  It further appears, however, that in the beginning of 2010, while Mitchell was still in California, things started to break down over the Wyvern Project.  *See, e.g.*, *doc. 131-5* at 29-30 (Gargoyles' personnel sent correspondence to Mitchell on March 1, 2010, addressing multiple issues the company was having with him, including his failure to assist in providing the necessary documentation for lowering insurance premiums—presumably for the leased unit in California; his failure to respond to

---

[7] Even though the Subcontract refers to Carbon Spider as the "Subcontractor," the Subcontract also states that Wyvern would be paying the proceeds of the completed project directly to Carbon Spider.

[8] In subsequent correspondence from Gargoyles' personnel to Wyvern, Gargoyles' personnel states that Gargoyles "was a subcontractor at the time to the primary contractor (Carbon Spider[),]" and further, that "Carbon Spider was contracted by [Wyvern] for the production of F5 test coupons." *Doc. 131-4* at 32.  As set forth above, however, the Subcontract defines Carbon Spider as the subcontractor, not Gargoyles.

numerous requests to execute and return Gargoyles' Confidentiality and Inventions Agreement; and his failure to complete the Wyvern Project by the specified due date, resulting in a loss of revenue); *doc. 131-5* at 35 (Curran sent correspondence to Mitchell on January 31, 2010, expressing his concern that "the wheels for JGR . . . are now 4 ½ months late" and that at this point, it will "be very hard . . . to collect any revenue . . ."); *id.* at 23 (Curran sent correspondence to Mitchell on February 2, 2010, further expressing his concerns for Mitchell's untimeliness in completing the JGR wheels, as well as Mitchell's dual role and how it may be negatively impacting Gargoyles); *see also id.* at 24-25 (Gargoyles' personnel eluding to the fact that Mitchell, during this time frame, is suffering from "health issues" and is considered to have resigned from Gargoyles).

As a result of this breakdown, Gargoyles' personnel ultimately informed Mitchell of the following: (1) that Mitchell, based upon previous communication, was considered to have resigned from Gargoyles, *doc. 131-5* at 30; (2) Mitchell was no longer permitted to access Gargoyles' rented premises in Santa Ana, California, *id.*; (3) Mitchell was to surrender all materials related to the Subcontract, as well as any molds and tooling, *id.*; (4) Mitchell owed Gargoyles the balance of the rent, which Mitchell would have received from the proceeds of the Wyvern Project, *id.* at 48; (5) Mitchell owed Gargoyles monies advanced to him to pay back child support, *id.*; (6) Mitchell owed Gargoyles $22,000 payable

upon receipt of the proceeds from the Wyvern Project, *id.*; and (7) finally, because Mitchell did not use Gargoyles' industrial unit in Santa Ana, California to conduct business on behalf of Gargoyles, and instead, used the unit to store his motorcycles for a period of 5.5 months, Mitchell also owed Gargoyles for the price of renting the unit, *id.*   It appears, however, based upon the record before the Court, that Mitchell did not comply with any of these directives.

Thus, it is on the basis of the foregoing that we believe Curran initiated the instant lawsuit.   And, in this lawsuit, Curran alleges that Gargoyles entered into a "sub-contractual agreement with Carbon Spider[.]"[9]  *Doc. 47* at 2, ¶ 3.   Curran also alleges that this Subcontract was subsequently assigned to him and that, therefore, he "has been assigned all rights and responsibilities" thereunder.   *Id.* at 2. Curran further alleges that Mitchell, while acting on behalf of Carbon Spider, breached the Subcontract by failing to: (a) pay Gargoyles the sum of $22,000; (b) deliver the tooling, shop aides, and fixtures valued at $25,000; and (c) pay tool rental in the amount of $15,000.  *Id.* at 2, ¶ 4.

In addition, Curran alleges that the Defendants "were provided rented production space and [Mitchell] was instructed to perform all work in the rental space," but that "[Mitchell] did not use the space for the purposes of conducting Gargoyles work," and instead, used the space for "personal storage for a period of

---

[9] We will continue to refer this "sub-contractual agreement" as the Subcontract.

7.5 months."[10]  *Id.* at 3, ¶ 5.   As a result, Curran claims that the monthly rental of that space was $1,015, and that, therefore, the Defendants owe him a total of $16,250.  *Id.*

Moreover, Curran alleges that Mitchell "requested an advance to satisfy his back child support obligation and he received an amount equal to $8,284.59[.]"  *Id.* at 3, ¶ 6.   Curran claims that he provided "such monies" to Mitchell and that Mitchell now seeks "to avoid paying those monies back via his resignation."  *Id.* Furthermore, Curran alleges that Mitchell sought to undermine his (Curran's) behavior by "provid[ing] both written and oral statements that were knowingly false in a clear effort to discredit [Curran]."  *Id.* at 3, ¶ 7.

Finally, Curran seeks to recover prejudgment interest, which, according to Curran, "is accruing at the rate of 6.0% per annum and will continue to accrue through trial, as well as post trial until judgment fulfillment."  *Id.* at 3, ¶ 8.

## III. Summary Judgment Standards.

The Defendants have moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[10] In the Amended Complaint, Curran asserts that Mitchell owes rent for using the industrial unit for "7.5 months."  *Doc. 47* at 3, ¶ 5.  In previous correspondence, however, Curran asserts that Mitchell owes rent for using the industrial unit for "5.5 months."  *See doc. 131-5* at 48.

R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.  When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Further, a party that moves for summary judgment on an issue for which he bears the ultimate burden of proof faces a difficult road. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011).   "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted).   A party who has the burden of proof must persuade the factfinder that his propositions of fact are true, and "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id.*   "Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*

### A. Statement of Facts Standards.

Pursuant to the Local Rules for the U.S. District Court for the Middle District of Pennsylvania, a party moving for summary judgment must attach to the motion "a  separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."   M.D. Pa. L.R. 56.1.   The non-moving party is required to submit "a separate, short and concise statement of the material facts, responding to the

numbered paragraphs set forth in [the moving party's statement of the material facts], as to which it is contended that there exists a genuine issue to be tried." *Id.* Both statements must reference the record for support, and the moving party's statement will be deemed admitted unless controverted by the non-moving party. *See id.*

Here, the Defendants, as the moving party, have filed a statement of material facts (*doc. 131*), supported by adequate references to the record.  Although Curran, as the non-moving party, has filed a brief in opposition to the Defendants' motion for summary judgment, Curran has failed to submit a statement of material facts, responding to the numbered paragraphs set forth in the Defendants' statement of material facts.   Thus, as we previously warned Curran, we will adopt the Defendants' statement of material facts. *See doc. 139* at 2 (warning Curran that failure to respond to the Defendants' statement of material facts will result in the adoption of such facts); *see also United States ex rel. Paranich v. Sorgnard*, 286 F. Supp. 2d 445, 447 n.3 (M.D. Pa. 2003) (adopting moving party's statement of facts where non-movant failed to comply with Local Rule 56.1), *aff'd*, 396 F.3d 326, 330 n.5 (3d Cir. 2005); *Larnerd v. Mong*, No. 1:14-CV-1204, 2015 WL 5601949, at *2 (M.D. Pa. 2015) ("A party's failure to comply with Local Rule 56.1 permits the court to deem the proponent's statement of material facts undisputed, even

when the opposing litigant is *pro se*.").   Accordingly, the undisputed facts are as follows.

## B. The Undisputed Facts.

### 1. The Purported Assignment of the Subcontract.

On September 15, 2009, Mitchell, acting on behalf of Carbon Spider, entered into the Subcontract with Gargoyles (*doc. 131-4* at 2-4)).[11]   *Doc. 131* at ¶ 1.   Curran claims that there is an "assignment document," signed by a member of the Gargoyles Board of Directors, making Curran the assignee of the Subcontract and any monies owed to Gargoyles thereunder.   *Id.* at ¶ 8(a).   No assignment document, however, has been produced, and it is believed that it does not exist. *Id.*   Instead, Curran has only provided Gargoyles Board of Directors' Meeting Minutes from three separate dates, none of which evidence any assignment of the Subcontract to Curran.   *Id.*   And, as proffered by the Defendants, Mitchell and Carbon Spider fully performed under the Subcontract. *Id.* at ¶ 9.

### 2. The Lease.

Even though a lease was executed by Gargoyles to rent the 1,200 sq.ft. industrial unit in Santa Ana, California, this lease was not a subject of the Subcontract. *Id.* at ¶ 10.   Rather, this lease was used for Gargoyles' benefit. *Id.* at

---

[11] Although not included in the Defendants' statement of facts, it appears that Curran was acting on behalf of Gargoyles as the President and CEO. *See doc. 131-4* at 4.

¶ 11.   Further, the Defendants never agreed to pay any part of the rent for this leased unit.  *Id.*

### 3. The Child Support Payments.

There are no terms, in the Subcontract, regarding the repayment of any funds that were used for Mitchell's back child support payments.  *Id.* at ¶ 12.   Although Curran states that an agreement regarding repayment of these funds is evidenced in e-mail exchanges as a "side agreement" made in support of the Subcontract, no e-mails evidencing this "side agreement" have been produced.   *Id.* at ¶ 13.  Moreover, at no time did the parties discuss repayment terms or reach any formal loan agreement regarding any funds that were used to pay Mitchell's back child support. *Id.* at ¶ 13.

### 4. The False Statements.

Any statements made by Mitchell to the FBI or Maryland SEC, regarding Curran and concerning the criminal investigation surrounding Curran and Gargoyles, were true.  *Id.* at ¶ 14.   Mitchell never made any false statements about Curran to any third-party.  *Id.* at ¶ 15.   In his deposition, Curran refers to e-mails, allegedly authored by Mitchell and sent to approximately twelve individuals, as well as postings in newspapers that included slanderous comments, yet, Curran has not produced documentation of these allegations. *Id.* at ¶ 8(c).  Curran has likewise

produced no monetary calculations of damages sustained by him due to the Defendants' alleged slander of his character. *Id.* at ¶ 8(d).

### 5. Discovery Regarding the Subcontract.

On December 24, 2014, the Defendants' counsel served Curran with Requests for Admissions (*doc. 131-1* at 11-16), Interrogatories (*doc. 131-1* at 18-43), and a Request for Production of Documents and Things (*doc. 131-1* at 45-52). *Id.* at ¶ 3.   Curran received the Defendants' discovery requests. *Id.* at ¶ 4.   Curran represented, however, that he would substitute documents rather than answer the Interrogatories. *Id.* at ¶ 5.   Only after this Court granted the Defendants' motion to compel discovery did Curran forward the discovery, which Defendants' counsel received on May 8, 2015. *Id.* at ¶ 6.   Curran, however, never provided any additional documentation to the Defendants beyond the 104 pages of documents he produced on May 8, 2015. *Id.*   The documents produced by Curran did not include a formal response to the previously served Requests for Production, nor did they identify which documents were responsive to such Requests. *Id.* at ¶ 7.   The documents produced by Curran also did not include all of the documents to which Curran referred in his deposition—as required pursuant to the Court's March 9, 2015 Order (*doc. 108*). *Id.* at ¶ 8.   Additionally, Curran has failed to provide a complete list of names and contact information for individuals that could serve as witnesses in connection with this case. *Id.* at ¶ 8(b)

**IV. Discussion.**

    **A.  The Defendants are Entitled to Summary Judgment on Curran's Breach of Contract Claims.**

      Curran's Amended Complaint contains several breach of contract claims based upon the following: (1) an assignment of the Subcontract; (2) the rental costs of the industrial unit allegedly leased to Mitchell; and (3) the repayment of funds used to pay Mitchell's back child support payments. *See generally doc. 47.* "Under Pennsylvania law, '[a] breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir. 2013) (quoting *Braun v. Wal–Mart Stores, Inc.,* 24 A.3d 875, 896 (Pa. Super. 2011)).  For the reasons that follow, we conclude that the Defendants are entitled to judgment as a matter of law with respect to all of Curran's breach of contract claims.

      **1. The Purported Assignment of the Subcontract.**

      In moving for summary judgment, the Defendants argue that although Curran testified at his deposition that there is an assignment document, which is allegedly signed by a Gargoyles' Director, no such document has ever been produced by Curran. *Doc. 130* at 11.  The Defendants further argue that the only document, which Curran has produced that even touches upon Curran's purported assignment of the Subcontract, is a section of the Minutes of Gargoyles' Board of Directors' Meeting, wherein the Board noted that it "would not impede any actions

18

[Curran] may wish to take as an individual against [Mitchell]." *Id.* at 11-12 (citing *doc. 131* at ¶ 8(a) n.2). As argued by the Defendants, however, these Minutes do not clearly demonstrate that Gargoyles had a present intent to transfer or divest all of its rights to Curran and that, therefore, no assignment occurred. *Id.* at 12.

"An assignment is a transfer of property or some other right from one person to another, and unless in some way qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Employers Ins. of Wausau v. Com., Dep't of Transp.*, 865 A.2d 825, 830 (Pa. 2005) (quoting *Pentlong Corp. v. GLS Capital, Inc.*, 820 A.2d 1240, 1249 (Pa. 2003)). "'Under the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor.'" *Crawford Cent. Sch. Dist. v. Com.*, 888 A.2d 616, 619-20 (Pa. 2005) (quoting *Employers Ins. of Wausau*, 820 A.2d at 830-31). "An assignee's rights, however, are not inferior to those of the assignor." *Crawford Cent. Sch. Dist.*, 888 A.2d at 620 (citing *U.S. Steel Homes Credit Corporation v. South Shore Development Corporation*, 419 A.2d 785, 789 (Pa Super. 1980)). Rather, "the assignee stands in the shoes of the assignor[.]" *Hedlund Manufacturing Company, Inc. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 358 (Pa. 1988).

Here, having reviewed the record and the parties' respective arguments, we conclude that the Defendants' motion for summary judgment with respect to

Curran's breach of contract claim based upon a purported assignment of the Subcontract should be granted.  In reaching this conclusion, we underscore the principle that "our job[, at the summary judgment stage,] is to ascertain solely whether there is a dispute of material fact[.]"  *Berckeley*, 455 F.3d at 201.  And, Curran, who is required to point to some evidence in the record to create a dispute of material fact, has not done so.  Instead, Curran has rested solely upon the conclusory statements contained in his Amended Complaint and brief to oppose the Defendants' motion for summary judgment.  Arguments made in briefs, however, "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

Moreover, although the Court recognizes Curran's deposition testimony—where Curran testified that there is, in fact, an "assignment document" (*doc. 131-2* at 38:16-39:8)—Curran, despite producing 104 pages of documents, has not produced this "assignment document," nor has he produced any evidence that either refers, resembles, or relates to such a document.[12]  Consequently, there is no

---

[12] Although Curran testified at his deposition that this "assignment document" is in his storage unit in Wilmington, North Carolina (*doc. 131-2* at 39:17-24), Curran also stated in his brief in opposition to the Defendants' motion for summary judgment, that he "[was] to be released from Detention on 18 April 2016 and [that he would be filing] an amended Response" upon being able to review the case file and various documents.  *Doc. 140* at 3.  Although 57 days have passed since his asserted release date, Curran has not filed an amended response, nor has he

dispute of material fact for trial.  Thus, we recommend granting the Defendants'

motion with respect to Curran's breach of contract claim based upon a purported

assignment of the Subcontract.

## 2. The Leased Property.

The Defendants also argue that although a lease—presumably for the

industrial unit in Santa Ana, California—was executed by Gargoyles, this lease

was not included in the Subcontract.  *Doc. 130* at 14.  The Defendants further

argue that they never agreed to pay for this lease.  *Id.*  Thus, the Defendants argue

that Curran's bald assertion that the leased space was misused does not create a

material question of fact.  *Id.*

Here, even viewing all of the facts and the reasonable inferences therefrom

in the light most favorable to Curran, we find that he has failed to establish a

breach of contract claim based upon the leased unit in Santa Ana, California.

Curran has, once again, provided nothing, other than his own conclusory

---

produced or filed the purported "assignment document." Thus, Curran, despite
being given the opportunity to "put up," has simply failed to do so. *See Berckeley
Inv. Grp.*, 455 F.3d at 201 (3d Cir. 2006) ("In this respect, summary judgment is
essentially 'put up or shut up' time for the non-moving party: the non-moving
party must rebut the motion with facts in the record and cannot rest solely on
assertions made in the pleadings, legal memoranda, or oral argument.); *Hammel v.
Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary
judgment is not a dress rehearsal or practice run; it is the put up or shut up moment
in a lawsuit, when a party must show what evidence it has that would convince a
trier of fact to accept its version of the events." (internal quotation marks and
citation omitted)).

statements contained in his pleading and brief, to oppose the Defendants' motion for summary judgment.   *See Jersey Cent. Power & Light Co.*, 772 F.2d at 1109–10.  Thus, we find that Curran has not rebutted the Defendants' motion by citing to particular parts of materials in the record to show a dispute of material fact.  And, having independently and thoroughly reviewed that record, we conclude that none of the 104 pages of documents, which Curran has produced, would allow a rational trier of fact to find that the Defendants agreed to pay Gargoyles or Curran for the leased unit.   Instead, the documents show that the lease agreement was solely between Gargoyles and Martin Investment Company.  *Doc. 131-4* at 8.   In any event, it is undisputed that the Defendants never agreed to pay any part of the rent for this lease.  *Doc. 131* at ¶ 11.  Thus, considering that there is no factual dispute for trial, we recommend granting the Defendants' motion with respect to Curran's breach of contract claim based upon the leased unit.

### 3. The Child Support Payments.

The Defendants also argue that Curran explicitly admitted that the terms regarding the child support payments were not in the Subcontract.  *Doc. 130* at 14. The Defendants further argue that at no time did the parties discuss repayment or reach any formal loan agreement in connection with the child support payments. *Id.*

Here, even viewing all of the facts and the reasonable inferences therefrom in the light most favorable to Curran, we nevertheless find that he has failed to establish a breach of contract claim based upon the purported child support payments.   We find, once again, that Curran has provided nothing, other than his own conclusory statements contained in his pleading and brief, to oppose the Defendants' motion for summary judgment.   *See Jersey Cent. Power & Light Co.*, 772 F.2d at 1109–10.  Thus, Curran, who is required to point to some evidence in the record to show a dispute of material fact, has not done so.

Moreover, although Curran testified at his deposition that the terms of the child support payments were not a part of the Subcontract, and were instead, a part of a "side agreement" documented in e-mails, *doc. 131-3* at 12:22-14:10, we find that none of the documents, which Curran has produced, either refer, resemble or relate to this "side agreement."   Rather, we find that the documents merely show correspondence between the Department of Child Support Services and Gargoyles' personnel, regarding the mandatory withholding of Mitchell's earnings and the forwarding of those earnings for the purpose of paying child support and health care coverage for his dependents.  *See doc. 131-5* at 3-5, 7.  These documents do not show that Mitchell agreed to repay Gargoyles or Curran—either directly or as

assignee—for the child support payments.[13]   As such, we recommend granting the Defendants' motion with respect to Curran's breach of contract claim based upon the purported child support payments.

### B. The Defendants are Also Entitled to Summary Judgment as to Curran's Defamation Claims Based on Libel and Slander.

The Amended Complaint also sets forth defamation claims based on libel and slander.  *See doc. 47.*  "Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. 2008); *see Elia v. Erie Ins. Exchange*, 634 A.2d 657, 660 (Pa. Super. 1993) ("[I]n order for defamation to occur in the form of either libel or slander, the defamatory statement must be published or communicated to a third person.").  "It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning."  *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215 (Pa. 1981) (libel); *see Tucker v. Phila. Daily News*, 848 A.2d 113, 123-24 (Pa. 2004)

---

[13] To the extent that Curran has copies of these emails in his storage unit in Wilmington, North Carolina, *see doc. 131-3* at 14:1-10, we briefly note that the production of those emails would make no difference in our recommendation. Curran consistently testified that this "side agreement" was between Gargoyles and Mitchell.  *See id.* at 13:21-15:24. At no point, however, does Curran suggest that he was assigned this "side agreement;" he only suggests that he was assigned the Subcontract.

(slander).  In Pennsylvania, a communication is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990) (citing *Birl*, 167 A.2d at 476) (quoting Restatement of Torts § 559 (1938))).  "If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Thomas Merton Ctr.*, 442 A.2d at 215-16 (citing Restatement (Second) of Torts § 614(1) (1977)) (libel); *see Tucker*, 848 A.2d at 124 (slander).

In moving for summary judgment, the Defendants argue that Curran has not produced support or documentation of any type of defamatory communications or of any damages that he sustained. *Doc. 130* at 16.  Thus, the Defendants argue that Curran has not satisfied his burden in showing that false statements were made or in showing that damages were suffered.  *Id.*  The Defendants further argue that statements Mitchell made to the FBI and Maryland SEC Investigators during their criminal investigation of Curran[14] are entitled to an absolute privilege since they relate to the a judicial proceeding.  *Id.*

---

[14]  Although the record is interspersed with vague references to a criminal investigation, the Court is in the dark as to these investigations and any statements that may have been made in connection therewith.

Here, having reviewed the record and the parties' respective arguments, we conclude that the Defendants' motion for summary judgment with respect to Curran's defamation claims based on libel and slander should be granted. Curran, who was required to point to some evidence in the record to show a dispute of material fact, has not done so. *See Jersey Cent. Power & Light Co.*, 772 F.2d at 1109–10. Moreover, despite Curran facing this "put up or shut up" moment in his lawsuit, Curran has yet to identify the content of the alleged defamatory communications.[15]   Without knowing the content of these communications, the Court is unable to determine whether they are in fact capable of a defamatory meaning—that is, whether the communication "'tends . . . to harm an individual's reputation as to lower him in the estimation of the community or [deters] third persons from associating or dealing with him.'" *U.S. Healthcare*, 898 F.2d at 923 (citing *Birl*, 167 A.2d at 476) (quoting Restatement of Torts § 559 (1938))). Thus, there is no basis upon which this matter should proceed to trial. *See Thomas Merton Ctr.*, 442 A.2d at 215 (citing Restatement (Second) of Torts § 614(1)

---

[15] When counsel for the Defendants asked Curran what the content of the defamatory communications were, Curran testified as follows:

> A. Each one was uniquely different in its wording.  I would have to give you copies of those.  I don't recall specifically what he said.  But they're in emails.

*Doc. 131-3* at 23:21-24:5.

(1977)) ("If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial."*).* Consequently, we also recommend granting the Defendants' motion with respect to Curran's defamation claims based on libel and slander.

## V. Recommendation.[16]

On the basis of the foregoing, **IT IS RECOMMENDED** that the Defendants' motion (*doc. 129*) for summary judgment be **GRANTED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the

---

[16] Although Curran, in his brief in opposition (*doc. 140*) to the Defendants' motion for summary judgment, appears to be alleging that he needs more time to litigate this case because of his current residency in a detention center, we find such allegations to be wholly inadequate since a review of the docket shows that Curran has been granted various extensions of time to oppose the Defendants' motion for summary judgment. Moreover, Curran himself has stated, in his brief in opposition to the Defendants' motion for summary judgment, that he was to be released from detention on April 18, 2016. We, however, have received no updates, communication, documentation, or otherwise, from Curran since April 11, 2016.

report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions. Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **15th** day of **June, 2016**.

**_S/ Susan E. Schwab_**
Susan E. Schwab
United States Magistrate Judge